## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Lawrence John Laveau, | **Civil No. 13-3198 (JNE/SER)** |
| Plaintiff, | |
| | |
| v. | **AMENDED REPORT &** |
| | **RECOMMENDATION**[1] |
| | |
| Carolyn Colvin, | |
| Acting Commissioner of Social Security, | |
| | |
| Defendant. | |

---

Sean M. Quinn, Esq., Falsani Balmer Peterson Quinn & Beyer, 306 Superior Street West, Suite 1200, Duluth, Minnesota 55802, for Plaintiff.

Ann M. Bildtsen, Esq., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Lawrence John Laveau ("Laveau") seeks review of the Acting Commissioner of Social Security's ("Commissioner") denial of his applications for a period of disability and disability insurance benefits ("DIB"). *See* (Compl.) [Doc. No. 1]. The parties filed cross-motions for summary judgment [Doc. Nos. 10, 14]. For the reasons set forth below, the Court recommends denying Laveau's Motion for Summary Judgment and granting the Commissioner's Motion for Summary Judgment.

---

[1]     This Report and Recommendation is amended to reflect the correct date for objections. *See* page 49.

## I.    BACKGROUND

### A.    Procedural History

Laveau filed his first application for DIB on April 17, 2006, with an alleged onset date ("AOD") of December 31, 2005. (Admin. R.) [Doc. Nos. 8, 9 at 59]. On February 18, 2009, administrative law judge ("ALJ") Roger W. Thomas ("ALJ Thomas") denied Laveau's claim. (*Id.* at 68). The Social Security Administration ("SSA") Appeals Council denied review of the ALJ decision. *Laveau v. Astrue*, Civil No. 11-505 (SRN/LIB), 2012 WL 983630, at *1 (D. Minn. Mar. 22, 2012) ("*Laveau I Order*"). Laveau sued in federal court, and the Honorable Susan Richard Nelson, adopting the Honorable Leo I. Brisbois's report and recommendation, denied Laveau's motion for summary judgment and granted the Commissioner's motion for summary judgment. *Id.* at *5; *see also Laveau v. Astrue*, Civil No. 11-505 (SRN/LIB), 2012 WL 983598 (D. Minn. Feb. 14, 2012) ("*Laveau I R&R*").

Laveau protectively filed his current application for DIB on July 16, 2010, alleging disability due to depression, anxiety, a skin disorder, and hearing loss.[2] (Admin. R. at 70, 88, 166–67, 188). Laveau's alleged onset date was February 13, 2009, but ALJ David B. Washington ("ALJ Washington")—the ALJ determining Laveau's second claim that is now before the Court—found this date was "a clerical error transmission as the decision issued by [ALJ Thomas] was on February 18, 2009." (*Id.* at 11); *see also* (*id.* at 70). Therefore, Laveau's

---

[2]    Protective filing is a written or oral statement that clearly establishes intent to file for Social Security Benefits. The effect of a protective filing is to preserve the date of application. For example, if a hypothetical claimant sends a letter postmarked to Social Security Administration on February 1 explaining she intends to file next month, February 1 becomes her filing date, even if she sends her application on March 27. Program Operations Manual System ("POMS"), GN 00204.010C.5.a–e. (SSA, Aug. 6, 2013). There is no special format for a protective filing, as long as it clearly expresses intent to file, although oral statements of intent to file for Title II benefits must be documented and signed by a SSA employee. POMS, GN 00204.010B.1–GN 00204.010B.4. (SSA, Aug. 6, 2013), *available at* https://secure. ssa.gov/apps10/poms.nsf/lnx/0200204010.

disability onset date was amended to February 19, 2009. (*Id.* at 11). Laveau listed his date last insured ("DLI") as December 31, 2010. (*Id.* at 70). His application was denied initially on January 11, 2011, and again upon reconsideration on May 2, 2011.[3] (*Id.* at 70, 72–78, 85–88, 92). ALJ Washington heard the matter on August 22, 2012. (*Id.* at 32–55). He returned a ruling unfavorable to Laveau on September 21, 2012, and specified that he was not reopening ALJ Thomas's unfavorable decision. (*Id.* at 11, 25). On October 24, 2013, the SSA Appeals Council denied review, rendering the ALJ's decision final. (*Id.* at 1–6); *see* 20 C.F.R. § 404.981. Laveau then sued in federal court. (Compl.) [Doc. No. 1].

### B.    Laveau's Background and Testimony

At the AOD, Laveau was 58 years old, making him an individual of advanced age. (Admin. R. at 24, 70). He had a high school education and previously worked in construction and as a security supervisor at an Air National Guard base. (*Id.* at 35, 50–52, 189). He also served in the military during the Gulf War era. (*Id.* at 131).

Laveau's testimony largely focused on his social anxiety and memory problems, and he implied that both of them inhibited his ability to work. Specifically, he testified that being around people made him "very nervous and upset," resulting in mistakes in his work. (*Id.* at 35). When asked by the ALJ, however, Laveau testified that he might be able to do a simple custodial job where he did not have to work much with others.[4] (*Id.* at 44–45). He testified that he did not leave the house very often, but he did some household chores and enjoyed woodworking. (*Id.* at 36–37). Laveau testified that he saw a social worker every month and a half to two months and was on medication for depression and anxiety. (*Id.* at 37). He also testified that in general, the

---

[3]    Although the reconsideration paperwork is dated April 28, 2011, *see* (Admin. R. at 72), it appears the SSA's date of denial is May 2, 2011. *See* (*id.* at 92).

[4]    References to "the ALJ" refer to ALJ Washington, who made the determination in this case, unless otherwise specified.

only people he saw besides his wife were his two friends—though they visited only occasionally—and that at family events, he would try to avoid conversation. (*Id.* at 36, 38–39). According to him, tasks he performed for many years now took much longer; he became distracted easily and made "rookie mistakes." (*Id.* at 40). He sustained a serious injury to his hand while working with a table saw; this injury resulted in some clumsiness with his hand, and he agreed that this was a mistake that he should have known better about. (*Id.* 43–44). He also reported significant memory problems: sleeping for twelve to fourteen hours and, upon awakening, having no memory of the past few days. (*Id.* at 41). According to Laveau, in those situations, he had to rely on his wife to tell him what he had done. (*Id.*).

Laveau testified about a couple of physical impairments. Specifically, he testified to a coughing problem that caused him to pass out, a hearing problem that was improved with aids, and a skin problem that was aggravated by heat and sun but that medication and a particular kind of soap alleviated. (*Id.* at 41–43).

### C.    Relevant Medical Record Evidence

Certain records in the Administrative Record concern impairments and illnesses that neither of the parties nor the ALJ base their analysis on, and therefore are not relevant—such medical records will not be summarized. Additionally, Laveau's medical records prior to the AOD at issue here were summarized in his past federal case. *See Laveau I R&R*, 2012 WL 983598, at *1–7 (summarizing medical records through January 6, 2009). The Court will not summarize them again.

### 1.   After February 19, 2009

#### a.   Mental Health Records

On March 17, 2009, Susanne W. Cohen, PhD ("Dr. Cohen"), a licensed psychologist, performed a neuropsychological evaluation of Laveau's memory. (Admin. R. at 1368). He reported memory problems for the previous six to seven months, and that his memory was worse in the last three to four months. (*Id.*). He also reported severe anxiety and thoughts of suicide, although he had no plan or intent to harm himself. (*Id.*). Laveau said he first had work problems three years ago and was fired for poor concentration, but also reported successfully completing a home project. (*Id.* at 1368–69). Laveau reported forgetting to shave on occasion but never when he had to be somewhere. (*Id.* at 1369). He reported forgetting where he puts things, forgetting to clean his ears, and forgetting to remove a turkey roll from the freezer. (*Id.*). Laveau reported leaving a stove burner on once, and also forgot to close the handle of the wood stove after adjusting the fire once. (*Id.*). He reported successfully using a medication manager for his pills, and because he gets nervous and lost, and panics easily, he drives only on a limited basis. (*Id.*). His wife manages their finances. (*Id.*).

Laveau reported a skin rash which has "largely resolved" using medication and a prescription topical agent. (*Id.*). He has hearing loss, but "good hearing with the use of his aids." (*Id.*). He has high cholesterol and wears glasses, which adequately correct his vision. (*Id.*). He lost his balance once, but was not treated for the fall, and it has not happened again. (*Id.*) His medications at that time were: trazodone, sertraline, gabapentin, bupropion, and simvastatin.[5] (*Id.*).

---

[5]   "Trazodone is primarily used for the treatment of depression. It is sometimes prescribed as a sedative." <u>Trazodone, Desyrel</u>, MedicineNet (July 1, 2014), http://www.medicinenet.com/trazodone/article.htm.

Laveau was appropriately dressed for the appointment with Dr. Cohen and cooperative. (*Id.* at 1371). Laveau reported his mood as "moody, down, blue" and admitted to thoughts of suicide, but had no plan or intent to act on those thoughts. (*Id.* at 1369). He prefers to keep his mind busy with projects, which elevates his mood. (*Id.*). He has increased anxiety in public, which keeps him in the house, and can only grocery shop with his wife for fifteen to twenty minutes before needing to leave the store. (*Id.*). He reported that he feels like he does not know what is bothering him, but can also identify the source of his heightened anxiety. (*Id.*). He reported that nervousness at work lead to "blocked thoughts," but he had less "anxiety[-]related thinking problems" at home compared to at work. (*Id.*). Laveau reported that he sees Danny L. Correll, MSW, LCSW ("Correll"), for individual therapy and Patricia Michals, RN, CNS ("Michals"), for medication management. (*Id.* at 1370). Although he has a history of chemical dependency, he has not used alcohol or smoked since 2008. (*Id.*).

Laveau is currently married and has four children from previous marriages. (*Id.*). He is not in contact with his daughter but reports having a great relationship with his sons. (*Id.*). Laveau reported increased anxiety "related to his fears of meeting work deadlines and making

---

Sertraline is "used to treat depression, obsessive-compulsive disorder (OCD), panic disorder, premenstrual dysphoric disorder (PMDD), posttraumatic stress disorder (PTSD), and social anxiety disorder (SAD)." Sertraline (Oral Route), Mayo Clinic (Dec. 1, 2014), http://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940.

Gabapentin "is used to help control partial seizures (convulsions) in the treatment of epilepsy." Gabapentin (Oral Route), Mayo Clinic (Dec. 1, 2014), http://www.mayoclinic.org/ drugs-supplements/gabapentin-oral-route/description/drg-20064011.

Bupropion "is used to treat depression and to prevent depression in patients with seasonal affective disorder (SAD), which is sometimes called winter depression. It is also used as part of a support program to help people stop smoking." Bupropion (Oral Route), Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/description/DRG-20062478.

Simvastatin is "[a] potent HMG-CoA reductase (the rate-limiting enzyme for cholesterol biosynthesis) inhibitor[ u]sed for the treatment of hyperlipidemia . . . ." *Stedman's Medical Dictionary*, Simvastatin (27th ed. 2000).

mistakes." (*Id.*). He was terminated from his last construction job in 2008 for "making too many mistakes." (*Id.*).[6]

Prior to the appointment, Laveau completed a computer-administered psychological test, the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). (*Id.* at 1371–72); *see also* (*id.* at 1374) (note of psychological testing). The results were considered invalid due to "likely exaggeration of psychological symptomatology." (*Id.* at 1371). Specifically, Dr. Cohen noted,

> Review of [Laveau's] responses indicates evidence for exaggeration of psychiatric symptoms, such that Mr. Laveau's endorsement of symptoms was greater than psychiatric samples in an inpatient setting. Moreover, Mr. Laveau endorsed a pattern of items rarely endorsed even by verified psychiatric or cognitively impaired samples, and suggests over endorsement of items in an indiscriminate fashion. It should be noted that [Laveau]'s responses were highly consistent across the test, indicating that confusion or attention problems are not the likely source of the elevated, invalid profile.

(*Id.* at 1372). Laveau's academic achievement level was average, and his intellectual functioning was at the high end of the low-average range. (*Id.* at 1372).

> Laveau continued to perform within the average to high average range across memory tasks. Immediate and delayed memory for paragraph length verbal information was above average, with better than average retention of the story material across time. Recall of geometric figures was above average immediately, and average after a delay. Recognition memory for the figures was above average.

(*Id.* at 1372). Dr. Cohen noted that there was "no evidence of impairment or measurable decline from two previous [memory] assessments." (*Id.* at 1373). Laveau's performance on time-sensitive tasks declined. (*Id.* at 1372).

Dr. Cohen noted the following DSM-IV diagnosis: Axis I: cognitive disorder, NOS; Axis II: deferred; Axis III: none; Axis IV: unemployed, financial and marital stress; Axis V: "GAF = by report 50–55."[7] (*Id.* at 1373).

---

[6]   This medical record also reviews Laveau's more distant medical history and work experience, which is not relevant to the instant case. *See* (Admin. R. at 1370–71).

Dr. Cohen's summary noted the following:

This pattern of continued intact memory with evidence for decline in intellectual functions is highly atypical. . . . [T]here continues to be no evidence of true memory impairment. [Laveau's] report of variable attentional and memory difficulties dependent upon context, and associated with heightened anxiety certainly suggests [the] possibility that cognitive functioning is diminished under anxious conditions. However, psychological testing was invalid at this time due to evidence for exaggerated symptom endorsement and it is not possible to make a formal psychiatric diagnosis or render an impression as to the extent to which psychiatric symptoms (anxiety and/or depression) may be contributing to cognitive functioning because of this invalid data.

(*Id.*).

On August 25, 2009, Dr. Othmane M. Alami ("Dr. Alami") saw Laveau for his yearly psychiatric evaluation. (*Id.* at 1333–34). Laveau reported doing well on his medications, and said that he did not feel sad, have a low energy level, or low motivation, and that he did not feel hopelessness or helplessness. (*Id.* at 1333). His mood was "euthymic" and his affect was "full,

---

[7]    Diagnosis of mental disorders requires a multiaxial evaluation. Axis I refers to the individual's primary clinical disorders that will be the foci of treatment; Axis II refers to personality or developmental disorders; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V refers to the clinician's assessment of an individual's level of functioning. *See,* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM–IV), (4th ed.1994), pp. 25–32.

*Carlson v. Astrue*, Civil No. 09-2547 (DWF/LIB), 2010 WL 5113808, at *16 n.3 (D. Minn. Nov. 8, 2010), *report and recommendation adopted by* 2010 WL 5100785 (Dec. 9, 2010).

Clinicians use the Global Assessment of Functioning Scale ("GAF"), a scale of zero to 100, to subjectively rate an adult client's psychological, social, and occupational or school functioning based on mental illness. *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (American Psychiatric Assoc. 4th ed. 1994). Scores from 41 to 50 indicate serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* Scores from 51 to 60 indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* Scores from 61 to 70 indicate some mild symptoms or some difficulty in social, occupational, or school functioning. A person with a GAF score between 61 and 70 is "generally functioning pretty well[ and] has some meaningful interpersonal relationships." *Id.*

fluid, and appropriate." (*Id.* at 1334). Dr. Alami described Laveau's memory and concentration as "good," but suggested that Laveau should have a sleep-medicine consult. (*Id.*).

Throughout the relevant time period, meaning from the AOD to DLI, Laveau saw Correll for sixteen acceptance and commitment therapy ("ACT") appointments between February 24, 2009, and December 2, 2010.[8] Correll consistently described Laveau as alert and oriented with a mild mood disturbance related to various personal circumstances. *See* (*id.* at 625, 1273, 1282, 1290, 1319–20, 1331–32, 1340–42, 1351, 1364, 1487–88, 1507, 1594, 1625, 1673–74, 1856, 2095). The majority of Correll's treatment notes discuss specific exercises and Laveau's responses to those exercises. The details of the treatment and exercises are not relevant to the ALJ's disability determination. Correll also assigned Laveau GAF scores in the range of 60 to 63. (*Id.* at 1283, 1287, 1320, 1329, 1342, 1365, 1488, 1626, 1674, 2095). Notably, on September 3, 2010, Laveau called Correll to say that he left his last appointment "feeling so great," that he's never felt "so good and so less burdened[,]" and he's "so at ease and so relaxed." (*Id.* at 1609).

Laveau had ten appointments with Michals for medication management and brief psychotherapy. Michals's notes for each appointment largely consist of a form that she filled out based on Laveau's reports and her own assessments, and contain only a brief narrative. Therefore, for each relevant appointment, when available, the Court describes Laveau's self-reported rating of depression, anxiety, and concentration on a scale from 1 to 10, where 10 was a

---

[8]    [ACT] is a unique empirically based psychological intervention that uses acceptance and mindfulness strategies, together with commitment and behavior change strategies, to increase psychological flexibility. Psychological flexibility means contacting the present moment fully as a conscious human being, and based on what the situation affords, changing or persisting in behavior in the service of chosen values.

Steven Hayes, Acceptance & Commitment Therapy (ACT), Ass'n for Contextual Behavioral Science, http://contextualscience.org/act (last visited Jan. 21, 2015).

severe or constant experience of the symptom or feeling. *See, e.g.*, (*id.* at 1359). The Court also describes Michals's overall impressions of Laveau's mood, and any medication adjustments made.

On March 18, 2009, Jason D. Nelson, NS CSS ("Nelson"), a psychiatric nurse practitioner student who worked with Michals, described Laveau's mood as "blunted and depressed," and that he had "psychomotor agitation." (*Id.* at 1365–67). Laveau was also "very anxious." (*Id.* 1367). Nelson noted that Laveau's memory was "intact." (*Id.* at 1366). Nelson noted the following DSM-IV diagnosis: "Axis I: Depressive Dis[order]; Axis II: deferred; Axis III: Chest Pain, Dyspnea, [Hyperlipidemia, Mixed]; Axis IV: social situations, hyper arousal/startle response, concentration; Axis V: 45."[9] (*Id.* at 1367).

On May 19, 2009, Laveau rated his depression as a 6, anxiety as a 7, and concentration as a 1. (*Id.* at 1359). Laveau reported having trouble with his memory and concentration, which may be associated with taking gabapentin. (*Id.* at 1359–60). Michals noted that his "[m]emory showed no major change since [the] last appointment." (*Id.* at 1360). His overall mood was moderately depressed. (*Id.*).

---

[9]     It is unclear whether "45" refers to a GAF score. *See* (Admin. R. at 1366). Michals's subsequent notes essentially provide the same diagnosis as this first appointment: recurrent major depressive disorder, chest pain, hyperlipidemia, and dyspnea. *See* (Admin. R. at 1310, 1324, 1335, 1345, 1357, 1435, 1461, 1600, 1626). The last three appointments reflect an additional diagnosis of sleep apnea, which is discussed later in this Report and Recommendation. *See* (*id.* at 1626, 1435, 1600). It is not clear whether the diagnoses were carried over from each appointment, or re-evaluated each time.
        Dyspnea is "[s]hortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude." *Stedman's Medical Dictionary*, Dyspnea (27th ed. 2000).
        Hyperlipidemia is "[e]levated levels of lipids in the blood plasma." *Stedman's Medical Dictionary*, Hyperlipidemia (27th ed. 2000).

On June 22, 2009, Laveau rated his depression as a 5, anxiety as a 6, and concentration as a 3. (*Id.* at 1347–48). He reported having nightmares "constantly," and Michals labeled his overall mood as moderately depressed. (*Id.* at 1348–49).

On August 12, 2009, Laveau rated his depression as a 5–6, anxiety as a 5, and concentration as a 4. (*Id.* at 1337). Michals noted his memory did not show any major changes. (*Id.* at 1338). Laveau reported that gabapentin helped his anxiety and irritability during the day, and helped him sleep at night. (*Id.* at 1339). Michals described his overall mood as depressed, but did not specify the severity. (*Id.* at 1338).

Laveau rated his depression as a 4 and concentration as a 5 on September 25, 2009. (*Id.* at 1326–27). Laveau did not rate his anxiety but stated, "[N]ot as bad as long as I stay on all of my meds." (*Id.* at 1326). His memory showed no major change, and he was mildly depressed. (*Id.* at 1327). Michals noted that Laveau was "back to baseline [and] doing well with current medication regimen." (*Id.* at 1328).

On December 15, 2009, Michals noted that Laveau had no major memory change. (*Id.* at 1314). Laveau rated his depression as a 4, stating "the medicine is working so great," and rated his anxiety as a 5. (*Id.* at 1313). With respect to concentration, Laveau noted, "I still wander off. I start doing one thing and all of a sudden I am doing 3 things but goes [sic] back to finishing all. I would like to stay and complete one thing at a time." (*Id.*). Michals's overall assessment was that Laveau was "stable, without serious functional impairment or serious symptoms." (*Id.* at 1315). Michals noted that he was overall doing "quite well," and was "having more restful sleep now that he is adjusted to the CPAP."[10] (*Id.* at 1315).

---

[10]     A continuous positive airway pressure ("CPAP") machine treats obstructive sleep apnea. *See* CPAP Machines: Tips for avoiding 10 common problems, Mayo Clinic (Nov. 15, 2011),

On May 25, 2010, Laveau rated both his depression and anxiety as a 4. (*Id.* at 1463–64). He rated his concentration as a 4, stating, "This is not so swell. Remembering is not so good either." (*Id.* at 1464). Michals noted that Laveau's overall mood was mildly depressed, and his mental health as "stable, no major changes; has chronic symptoms/dysfunction." (*Id.* at 1465–66).

On July 6, 2010, Laveau rated his depression and anxiety at 8. (*Id.* at 1629). With respect to concentration, Laveau stated "I am good for [three] minutes then wander off." (*Id.* at 1629). He reported his memory as "terrible." (*Id.* at 1629). Michals reported that Laveau stopped using trazodone, and that she would increase his zolpidem prescription to 12.5 mg.[11] (*Id.* at 1631). Michals described Laveau's overall mood as moderately depressed and his mental health as "altered & medication(s) adjusted to aid coping/symptoms." (*Id.* at 1630–31).

On August 24, 2010, Laveau described his anxiety and depression both at 8. (*Id.* at 1438). Laveau described his concentration at level 4, "on a good day." (*Id.*). Laveau's overall mood was moderately depressed, he showed no major change in memory since his last appointment, and his overall mental health status was "altered & medication(s) adjusted to aid coping/symptoms." (*Id.* at 1440). Laveau believed his increase in symptoms was due to not getting enough sleep, and Michals added trazodone to help with sleeping. (*Id.* at 1441).

On October 21, 2010, Laveau reported a 6 (moderate) for depression, and a 5 (moderate) for anxiety. (*Id.* at 1602–03). His concentration was rated 8, which is severe, but was also found to be adequate for daily living. (*Id.* at 1603). There was no change to his memory, and Michals noted his overall mood as moderately depressed. (*Id.* at 1603–04). Michals marked that Laveau's

---

http://www.mayoclinic.org/diseases-conditions/sleep-apnea/in-depth/cpap/art-20044164. Laveau's diagnosis of sleep apnea is discussed below.

[11]     Zolpidem is used to treat insomnia. Zolpidem (Oral Route), Mayo Clinic (Dec. 1, 2014), http://www.mayoclinic.org/drugs-supplements/zolpidem-oral-route/description/drg-20061195.

overall mental health was "stable, no major changes; has chronic symptoms/dysfunction." (*Id.* at 1605). She assigned him a GAF score of 63. (*Id.* at 1606).

### b.      Other Medical Records

#### i.      Sleep Apnea

On October 15, 2009, Laveau had a sleep study, and was diagnosed with mild obstructive sleep apnea.[12] (*Id.* at 1323). He was trained on using a CPAP unit, and reported "sleeping much better" about a week later. (*Id.* at 1321–22).

#### ii.      VA Disability Determination

On July 28, 2009, the Department of Veterans Affairs (the "VA") issued a decision based on its reconsideration of one of its earlier decisions, which Laveau appealed. (Admin. R. at 131). The VA reviewed several documents, but its decision largely rested on Dr. Cohen's neuropsychological exam on March 17, 2009.[13] (*Id.* at 132). The decision states that Laveau is "totally disabled due to [his] service connected mental health condition and skins condition [sic]."[14] (*Id.* at 132). A letter from the VA dated July 31, 2009, states that Laveau's entitlement rate is 100% because he is "unable to work due to [his] service-connected disabilities." (*Id.* at 159–60).

---

[12]     Sleep apnea means the absence of breathing while sleeping, and is "associated with frequent awakening and often with daytime sleepiness." *Stedman's Medical Dictionary*, Apnea, Sleep apnea (27th ed. 2000).

[13]     The VA's decision refers to Laveau's "examination dated March 17, 2009." (Admin. R. at 132). The only medical records on that date are Dr. Cohen's exam and the accompanying psychological testing. (*Id.* at 1368, 1374).

[14]     Disabilities are considered "service connected" when they are the result of "an injury or illness that was incurred or aggravated during active military service." Disability Compensation, Fed. Benefits for Veterans, Dependents & Survivors, Ch. 2 Service-connected Disabilities, Office of Public & Intergovernmental Affairs, U.S. Dep't of Veterans Affairs, *available at* http://www.va.gov/opa/publications/benefits_book/benefits_chap02.asp (last visited Jan. 21, 2015).

### iii.     Speech Pathology

On January 15, 2010, Laveau had an appointment with David J. Schafer, MS, CCC-SLP ("Schafer"), a speech pathologist. (*Id.* at 1492). Laveau reported that his wife says he sometimes has distorted speech when he is anxious, but said it was not a "functional communication problem." (*Id.* at 1492). He reported misinterpreting what he hears, and cannot stay interested in reading, although he used to be an avid reader. (*Id.* at 1492). His handwriting has become significantly worse. (*Id.* at 1492–93). Laveau stated that his ability to pay attention is poor and that he has reduced concentration. (*Id.* at 1493). It sometimes takes him three times longer than usual to finish a familiar task, and he misses his medication about 10% of the time due to his poor memory. (*Id.*).

Schafer explained that a personal data assistant ("PDA") may be used to assist Laveau and he expressed an interest in trying it. (*Id.*). Schafer set three individual therapy sessions to assist Laveau with using a PDA. (*Id.*at 1494). Schafer used a functional independence measure ("FIM") to assess five categories of cognition. (*Id.* at 1494). On a scale of 1 to 7, 1 is "total assistance," and 7 is "complete independence." (*Id.*) Schafer assigned a 5 in the category of memory, and a 7 each of the following categories: comprehension, expression, social interaction, and problem solving. (*Id.*). Laveau was trained on the PDA on January 19, 2010, and reported that it was working well the following day. (*Id.* at 1488, 1674). Laveau's FIM scores were the same as they were at the previous appointment. (*Id.* at 1489).

On February 11, 2010, Laveau again saw Schafer for assistance with his PDA. Laveau received training on setting up alarms for his medications, and stated that "he could manage use of the device more effectively following this training." (*Id.* at 1478). No further appointments were scheduled. (*Id.* at 1479).

14

### iii.    Head Injury

On May 6, 2010, Laveau went to the emergency room at Community Memorial Hospital after suffering a head injury two days earlier while building a false wall. (*Id.* at 1213). His CT scan was normal.[15] (*Id.* at 1990).

### 2.    After December 10, 2010

Laveau continued appointments with Correll through July 2012, and with Michals through August 2012. *See* (*id.* at 1846, 2010, 2012, 2030, 2045, 2070, 2125, 2133, 2192) (appointments with Correll from January 21, 2011, through July 31, 2012); (*id.* at 1839, 1848, 2000, 2018, 2039, 2116, 2185) (appointments with Michals from January 21, 2011, through August 1, 2012).

On April 11, 2012, Laveau cut four fingers on his right hand while working with a table saw. (*Id.* at 2139). He had surgery the same day and had ten physical therapy appointments between April 26, 2012, and August 6, 2012. (*Id.* at 2151, 2153, 2155, 2157, 2159, 2161, 2163, 2165, 2167, 2172, 2178).

### 3.    Mental Consultative Examination [16]

On December 18, 2010, Dr. Lyle W. Wagner, PhD, LP ("Dr. Wagner"), examined Laveau's mental status. (*Id.* at 1751). Dr. Wagner summarized:

---

[15]    A CT scan refers to the "imaging anatomic information from a cross-sectional plane of the body, each image generated by a computer synthesis of x-ray transmission data obtained in many different directions in a given plane." *Stedman's Medical Dictionary*, Tomography, Computed Tomography (CT) (27th ed. 2000).

[16]    A consultative examination takes place "[i]f [the claimant's] medical sources cannot or will not give [the SSA] sufficient medical evidence about [the claimant's] impairment for [the SSA] to determine whether [the claimant is] disabled or blind[.]" 20 C.F.R. § 404.1517. "[The SSA] may ask [the claimant] to have one or more physical or mental examinations or tests. [The SSA] will pay for these examinations. However, [the SSA] will not pay for any medical examination arranged by [the claimant or the claimant's] representative without [the SSA's] advance approval." *Id.*

Regarding his ability to concentrate on and remember instructions, it would appear that [Laveau] is capable of concentrating on and remembering moderately complex instructions. Regarding his ability to understand such instructions, it would appear that he is capable of understanding moderately complex instructions.

Regarding his ability to persist at a reasonable pace to complete a particular task, he may have some difficulty in this area due to his current level of depression/anxiety, which appears to be mild, but not to the extent that employment would be precluded. Regarding his ability to tolerate co-workers, the public, and to handle supervision, by self-report, when [Laveau] has worked, he has gotten along fair with co-workers and good with supervisors, except his last supervisor. [Laveau] related well with this psychologist.

Regarding his ability to manage stress and pressure in a work setting, he may have some difficulty in this area, due to his current level of depression/anxiety, but not to the extent that employment would be precluded.

(*Id.* at 1754–55).

Dr. Wagner made several diagnostic conclusions: "Major Depressive Disorder, Recurrent, Mild without Psychotic Features[;] Anxiety Disorder Not Otherwise Specified[;] Alcohol Abuse/Dependence in Full Sustained Remission, and a diagnosis on Axis II in terms of a specific personality disorder is deferred." (*Id.* at 1755). Dr. Wagner listed Laveau's GAF score as 65. (*Id.* at 1756).

### 4. State Agency Medical Consultants' Opinions

#### a. Physical RFC Assessment

On January 11, 2011, Dr. Charles T. Grant, MD ("Dr. Grant"), conducted a physical residual functional capacity ("RFC") assessment. (*Id.* at 1780–87). After reviewing Laveau's medical file, Dr. Grant concluded that although Laveau had hearing loss and a skin disorder, these conditions did not pose any exertional limitations. (*Id.* at 1781). Dr. Grant opined that Laveau had no postural limitations, manipulative limitations, or visual limitations. (*Id.* at 1782–83). He also stated that Laveau had a communicative limitation regarding hearing and an

environmental limitation such that he should avoid concentrated exposure to noise. (*Id.* at 1784). He found Laveau's allegations were "of limited credibility" and concluded that Laveau's "physical impairments pose minimal functional limitations." (*Id.* at 1785).

At the reconsideration level on April 28, 2011, Steven Richards, MD ("Dr. Richards"), reviewed the updated medical evidence record. (*Id.* at 1972). Dr. Richards noted that there were no new sources or medical evidence records, and that Laveau's "allegations [were] deemed to be partially credible." (*Id.* at 1971). Dr. Richards affirmed Dr. Grant's RFC determination. (*Id.*).

### b.    Mental RFC Assessment

On January 10, 2011, State Agency consultant Sharon Frederiksen, PhD, LP ("Dr. Frederiksen"), reviewed the medical record and completed a psychiatric review technique ("PRT").[17] (*Id.* at 1762–74).

In the PRT, Dr. Frederiksen indicated that Laveau had medically determinable impairments that would require an RFC assessment regarding Listing 12.04, which addresses affective disorders. (*Id.* at 1762). Dr. Frederiksen noted that mild overt depression/anxiety was present that did not precisely satisfy the diagnostic criteria at issue in the Listing. (*Id.* at 1765).

---

[17]    The Psychiatric Review Technique described in 20 C.F.R. 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

*Policy Interpretation Ruling Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P, 1996 WL 374184, at *4 (July 2, 1996).

She found mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (*Id.* at 1772). Dr. Frederiksen made no comment on the presence of the "paragraph C" criteria, nor did she assign Laveau a GAF score. *See* (*id.* at 1773). Her notes state that Laveau's mental health symptoms are under "good control" with medication and counseling with a social worker, and that Laveau reports symptoms that are more severe than those reported in his mental health contacts. (*Id.* at 1774). Dr. Frederiksen stated that it is possible that he has some reduction in stress tolerance and contact with others. (*Id.* at 1774).

In the RFC assessment, as in the PRT, Dr. Frederiksen expressed skepticism that Laveau's mental impairments were as severe as he alleged. (*Id.* at 1778). She found moderate limitations in the ability to maintain attention and concentration for extended periods, the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to respond appropriately to changes in the work setting, and the ability to set realistic goals or make plans independently of others. (*Id.* at 1776–77). Dr. Frederiksen noted that Laveau's symptoms are "in good control" and his GAF scores are in the low 60s. (*Id.* at 1778). Dr. Frederiksen concluded:

> [Laveau] retains sufficient mental capacity to concentrate on, understand, and remember routine, 3–4 step, and detailed instructions, but would be markedly limited for complex/technical instructions.
>
> [Laveau]'s ability to carry out routine repetitive, 3–4 step, and limited detailed tasks with adequate persistence and pace would not be significantly limited, but would be markedly limited for detailed or complex/technical tasks.
>
> [Laveau]'s ability to handle co-worker and public contact would be reduced but adequate to handle brief and superficial contact with a few others; reports increase anxiety in crowds, mostly stays around home but is able to walk

and drive and attend AA. No significant problems interacting at [mental health] contacts or at [consultative examiner] exam.

[Laveau]'s ability to handle supervision would be restricted secondary to reduced stress tolerance but adequate to cope with reasonably supportive supervisory styles that could be expected to be found in many customary work settings.

[Laveau]'s ability to handle stress and pressure in the work place would be somewhat reduced. It would be adequate to tolerate the routine stresses of a routine repetitive, a 3–4 step, or a limited detail work setting, but not adequate for the stresses of a multi-detailed or complex work setting.

[Symptom] intensity as reported/endorse[d] is only very partially supported by [mental health] contacts, testing, and observations at Psy [consultative] exam.

(*Id.*).

At the reconsideration level on April 27, 2011, State Agency consultant James M. Alsdurf, PhD, LP ("Dr. Alsdurf"), reviewed the updated medical evidence record. (*Id.* at 1967). Dr. Alsdurf stated that Laveau's reports about his activities of daily living were not supported, and affirmed Dr. Frederiksen's evaluation. (*Id.* at 1967–68).

## D.   Medical Expert Testimony

James J. Prokop, PsyD, testified as a medical expert ("Dr. Prokop" or the "ME") at the hearing before the ALJ.[18] (*Id.* at 45, 114). After reviewing Laveau's medical records, the ME testified that Laveau has a history of reoccurring, mild depressive episodes and generalized anxiety disorder. (*Id.* at 45–46). He found Laveau's limitations on activities of daily living to be mild based on Laveau's GAF scores, and found Laveau's social function was limited moderately. (*Id.* at 45–46).

---

[18]   Although the transcript identifies the ME as "Dr. Prokoff," the ALJ decision and the ME's resume note the correct name is Dr. Prokop. *See, e.g.*, (Admin. R. at 21, 33, 114).

The ME explained that Laveau's ability to maintain concentration and pace is ranked as moderate because although Laveau is able to concentrate and understand even moderately complex instructions, he has trouble "retain[ing] the instructions well enough to perform consistently and adequately when employed," which could be due, in part, to his depression and anxiety. (*Id.* at 47). The ME testified that Laveau did not meet the Listings but that certain work restrictions would be appropriate, such as, "simple, routine, repetitive, one, two, three step, unskilled work; brief and superficial contact with the general public; and no[] complex or detailed tasks." (*Id.* at 48).

Laveau's attorney further inquired into the type of work conditions Laveau should avoid. (*Id.* at 49). The ME clarified that Laveau's work environment should not include contact with the general public, loud noises, or unexpected changes in the work routine. (*Id.*) The ME testified that making mistakes and becoming distracted were consistent with the ME's diagnosis. (*Id.* at 49–50).

### E.    Vocational Expert Testimony

Edward Utities testified as a vocational expert ("VE") at the hearing before the ALJ. (*Id.* at 50). He holds a BS degree from Northland College and a MS degree in counseling from the University of Wisconsin. (*Id.* at 113). After obtaining additional information from Laveau at the hearing, the VE identified Laveau's past employment as a carpenter, which is listed as a heavy, low-end semi-skilled occupation; and as a security supervisor, which is listed as a light, high-end semi-skilled occupation. (*Id.* at 52). The ALJ asked the VE the following hypothetical question:

> Let's assume that a person is limited to simple, routine, repetitive type work activity, one, two, three step. Person would not be able to handle any complex or detailed work activity.
>
> The person would not be able to work at a job involving dealing with the general public, like sales, and the person would be limited to just brief and superficial

contact with co-workers and supervisors. I take it that such a person would not be able to do any of the Claimant's past work.

(*Id.*). The VE agreed to this statement. (*Id.*).

The ALJ then asked whether there would be any other jobs the hypothetical individual could perform, adding the following three stipulations: the hypothetical individual could not be outdoors in the sunlight, could not work in a setting involving frequent loud noises, and could not have work duties that changed on a frequent basis. (*Id.* at 52–53). The VE answered yes, and identified two jobs that he believed an individual with such limitations could perform: the job of a custodian and the job of a machine cleaner. (*Id.* at 53).

Next, Laveau's attorney questioned the VE. (*Id.* at 53–54). The VE clarified that the two jobs he identified as suitable for Laveau were of medium skill level. (*Id.* at 54). Laveau's attorney then asked the VE the following hypothetical question: "[I]f [Laveau] were to lose concentration or become distracted from his work tasks such that he went off task for 15, 20 minutes at a time, two, three times a shift, I take it that would be unacceptable to an employer."

(*Id.*) The VE agreed to this statement, adding:

[V]arious studies and my experience show that a person isn't necessarily productive for a full eight hours in a normal workday. If a person was off task for say 10 percent or less, I think that would still be within an acceptable range, but anything substantially beyond that, it's my opinion most employers simply wouldn't tolerate.

(*Id.* at 54). This concluded the hearing. (*Id.* at 54–55).

### E.   The ALJ's Decision

On September 21, 2012, the ALJ issued a finding that Laveau was not disabled after following the five-step process. (Admin. R. at 8, 12); *see* 20 C.F.R. § 404.1520(a)(4). In accordance with this process, The ALJ considered: (1) whether Laveau was engaged in substantial gainful activity; (2) whether Laveau had a severe medically determinable impairment

or a severe combination of impairments; (3) whether Laveau's impairment or combination of impairments met the criteria of an impairment listed in 20 C.F.R Part 404, Subpart P, Appendix 1, also known as "The Listings"; (4) whether Laveau could return to his past work; and (5) whether Laveau could do any other work in light of his residual functional capacity, age, education, and work experience. *See* 20 C.F.R. § 404.1520(a)(4).

At the first step, the ALJ concluded "the claimant did not engage in substantial gainful activity during the period from his alleged onset date of February 19, 2009[,] through his date last insured of December 31, 2010." (*Id.* at 14).

At the second step, the ALJ found that Laveau had the following severe impairments: "cognitive disorder, NOS; depression; anxiety; history of alcohol dependence in long term sustained remission; hearing loss; and skin disorder."[19] (*Id.*). He cited various pieces of evidence documenting these impairments and concluded, "[a]fter review of the record, the undersigned finds the above-listed impairments are severe as they cause more than minimal functional limitations on the claimant's ability to perform basic work activities." (*Id.* at 15).

At the third step, the ALJ found Laveau did not have an impairment or combination of impairments that met or medically equaled one of the Listings. (*Id.*). Specifically, the ALJ considered Listing 12.02 regarding organic mental disorders, Listing 12.04 regarding affective disorders, and Listing 12.09 regarding substance addiction. (*Id.*). In making this determination, the ALJ considered whether the "paragraph B" criteria of those particular listings were satisfied.[20] (*Id.*). The ALJ concluded that Laveau had a mild restriction in activities of daily

---

[19]     "NOS" means that the cognitive disorder is not otherwise specified. DSM-IV 163. In other words, it does not meet the criteria for the specific cognitive disorders listed in that section of the DSM-IV. *Id.*

[20]     The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the

living because although Laveau needed "to be reminded to shave, take medications, and feed himself," he could also help with a variety of household duties. (*Id.*). The ALJ concluded that Laveau had moderate difficulties in social functioning because he talked on the phone a few times a week and his relationships with his children, friends, co-workers, and supervisors largely ranged from "fair" to "good," but he did not "go out in public very often as he gets nervous around others" and has undergone ACT therapy. (*Id.* at 15–16). The ALJ also concluded that Laveau had moderate difficulties maintaining concentration, persistence, or pace based on Laveau's self-reported difficulties with memory related tasks and attention span. (*Id.* at 16). Additionally, after administering several tests, the consultative examiner ranked Laveau's recall abilities as within the average range. (*Id.*). Finally, the ALJ noted that, according to the record, Laveau had not experienced any episodes of decompensation of extended duration. (*Id.*). The ALJ stated, "Because the claimant's mental impairments did not cause at least two 'marked'

---

degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months. . . . Each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There are additional functional criteria (paragraph C criteria) in 12.02, 12.03, 12.04, and 12.06, discussed herein. We will assess the paragraph B criteria before we apply the paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B criteria are not satisfied. We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied. . . .

The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description that is manifested by the medical findings in paragraph A.

20 C.F.R. 404, Subpt. P, App. 1, § 12.00(A).

limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria were not satisfied." (*Id.*). The ALJ also decided that "paragraph C" criteria were not met. (*Id.*).

Before moving on to the fourth step, the ALJ analyzed Laveau's residual functional capacity (RFC), and found

> [Laveau] had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except [Laveau] is limited to simple, routine, repetitive 1 to 3 step work activities; would not be able to handle complex or detailed work activity; would not be able to work at a job dealing with the general public. He would be limited to brief and superficial contact with co-workers and supervisors. He is further limited to work that does not involve being outdoors and in the sunlight; work with no frequent loud noises and would require a stable work environment with the same work activity with no changes of duty on a frequent basis.

(*Id.* at 16–17). In support of his RFC determination, the ALJ asserted that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," based on the requirements. (*Id.* at 17).

The ALJ then applied the requisite two-step test for considering Laveau's symptoms and credibility in light of medical evidence and subjective complaints. First, the ALJ must determine "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce [Laveau's] pain or other symptoms." (*Id.*). Second, the ALJ must "evaluate the intensity, persistence, and limiting effects of [Laveau's] symptoms to determine the extent to which they limit [Laveau's] functioning." (*Id.*).

The ALJ wrote:

> [Laveau] alleges he is unable to work due to depression, anxiety, skin disorder and hearing loss. However, the overall objective medical evidence, course of treatment, medications, and daily activities, absence of medical opinions supporting such limitations, third-party statements[,] and the overall evidence do not support the alleged disabling limitations set forth in testimony and in the record as a whole.

24

(*Id.*) (citation omitted).

The ALJ found that Laveau's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Laveau's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC]." (*Id.* at 18).

The ALJ first noted that the VA award of disability benefits at the 100% rate did not bind him to award Laveau a similar benefit because the SSA's standards for the receipt of disability benefits are different from those of the VA. (*Id.*).

The ALJ stated, "The medical records reveal mild symptoms and improvement with medications." (*Id.*). Next, he referred to a psychotherapy appointment on March 18, 2009, during which Laveau presented highly anxious behaviors and reported social anxiety. (*Id.*). The ALJ then mentioned the neuropsychological evaluation that Laveau underwent on March 30, 2009, and he noted that Laveau was "service connected for depression, bilateral tinnitus, tinea veriscolor [sic], bilateral hearing loss and hernia."[21] (*Id.*). The ALJ reported that "a previous neuropsychological evaluation in June 2006 indicated no evidence of memory impairment and service connection for depression with memory loss was subsequently modified to depression without memory loss." (*Id.*). Results from a psychological test administered during this evaluation were "considered invalid due to likely exaggeration of psychological

---

[21]     Tinnitus is the "[p]erception of a sound in the absence of an environmental acoustic stimulus. The sound can be a pure tone or noise including (ringing, whistling, hissing, roaring, or booming) in the ears. Tinnitus is usually associated with a loss of hearing." *Stedman's Medical Dictionary*, Tinnitus (27th ed. 2000).
    Tinea versicolor is "an eruption of tan or brown branny patches on the skin of the trunk, often appearing white, in contrast with hyperpigmented skin after exposure to the summer sun; caused by growth of the fungus *Malassezia furfur* in the stratum corneum with minimal inflammatory reaction." *Stedman's Medical Dictionary*, Tinea versicolor (27th ed. 2000).

symptomatology." (*Id.*). He stated that Laveau "continued to perform within the average to high average range across memory tasks." (*Id.* at 18). The ALJ noted:

> Review of his responses indicates evidence of exaggeration of psychiatric symptoms, such that the claimant's endorsement of symptoms was greater than psychiatric samples in an inpatient setting. Moreover, the claimant endorsed a pattern of items rarely endorsed even by verified psychiatric or cognitively impaired samples, and suggests over endorsement of items in an indiscriminate fashion. It was also noted that the claimant's responses were highly consistent across the test, indicating the confusion or attention problems are not the like [sic] source of the elevated, invalid profile.

(*Id.* at 19). Laveau was diagnosed with cognitive disorder, NOS, and was given a GAF score of 50–55. (*Id.*).

The ALJ also mentioned that in April 2009, Laveau worked with a therapist to control his thoughts and emotions, and the ALJ noted a diagnosis of recurrent major depression in partial remission and a GAF score of 63. (*Id.*). The ALJ stated that Laveau experienced problems sleeping in August 2009, but Laveau was doing well on the combination of medications he was on and denied feeling sad or having a low energy or motivation level. (*Id.*).

The ALJ described Laveau's appointment in December 2009, to confirm a diagnosis of obstructive sleep apnea. (*Id.*). Treatment notes demonstrated that medication was working. (*Id.*).

The ALJ then described Laveau's medical records from 2010. Specifically, the ALJ wrote that Laveau had a psychosocial assessment on January 14, 2010, "alleging continued memory problems related to his mental illness . . . ." (*Id.*). The ALJ noted that on January 15, 2010, Laveau underwent a speech pathology consult during which his hearing loss in both ears was noted. (*Id.*). In this same visit, Laveau "reported having distorted speech at times, problems with listening, difficulty with reading and writing . . . some changes in his functional cognitive skills, [and] poor concentration and poor memory." (*Id.*). At that time, Laveau reported "complete independence in comprehension, expression, social interaction, and problem solving."

26

(*Id.* at 20).

The ALJ noted that in October 2010, Laveau was taking Wellbutrin for depression and received a GAF score of 64, and on December 2, 2010, Laveau received a score of 26 on the BDI-II depression screening test, suggesting moderate depression.[22] (*Id.*).

The ALJ then reviewed Laveau's appointment on December 18, 2010, with the consultative examiner, Dr. Wagner. (*Id.*). At this appointment, Laveau reported "mental health issues involving anxiety and depression and that he becomes overwhelmed, is forgetful and easily frustrated." (*Id.*). At the same appointment, Laveau discussed lower back pain, difficulty hearing, blotches on his skin, and sleep apnea. (*Id.*). "The clinical impressions were mild anxiety, NOS; mild depression; and alcohol abuse, in full remission since 2007." (*Id.*). Dr. Wagner then issued a medical source statement concluding that Laveau could concentrate on, understand, and remember moderately complex instructions, but he may have some difficulty persisting at a particular pace to complete a particular task due to his level of depression/anxiety. (*Id.*). Dr. Wagner concluded, however, that such limitations were too mild to preclude employment. (*Id.*). The ALJ also mentioned Dr. Wagner's finding that Laveau would have some difficulty managing stress and pressure in a work setting. (*Id.*).

The ALJ next discussed Laveau's credibility. Noting that his GAF scores tended to be in the 55–65 range, the ALJ found the level of functioning in treatment notes is "inconsistent with the level of depression and anxiety limitations alleged in [Laveau's] testimony. The undersigned finds the mental status examinations are supportive of an individual who is functioning at a level[] higher than she [sic] alleges[,]" which is also supported by Laveau's "conservative course of treatment." (*Id.*). The ALJ reviewed Dr. Prokop's testimony and noted that Laveau's

---

[22]     Wellbutrin is the brand name for bupropion. *See supra* note 5.

"psychological problems have been managed with treatment and with antidepressants," and nothing in Laveau's treatment precludes work consistent with the RFC determination. (*Id.* at 21). The ALJ again noted that "mental status examinations are supportive of an individual who is functioning at levels higher than [Laveau] alleges." (*Id.*).

The ALJ turned briefly to the question of Laveau's bilateral hearing loss and skin disorder, noting that the hearing loss was only mild to moderate and that "[t]here has been little subsequent treatment for these physical conditions and no work-related limitations have been imposed by any treating physician related to these conditions." (*Id.*). The ALJ gave [Laveau] "the benefit of the doubt" and limited him to work that does not involve being outdoors, being in the sunlight, or encountering frequent loud noises. (*Id.*).

Next, the ALJ found Laveau's allegations of difficulty concentrating and memory loss not fully credible. (*Id.*). The ALJ noted that Laveau's past records indicate an inability "to perform consistently and adequately when employed." (*Id.*). But during the time period currently under consideration, the consultative examiner found Laveau could concentrate and remember complex instructions and Dr. Prokop found Laveau had moderate limitations in concentration, persistence, and pace. (*Id.*). Dr. Prokop testified that Laveau's GAF scores in the sixties suggested mild symptoms, and he testified that "a moderate limitation in functioning was supported." (*Id.*). The ALJ found "the evidence does not support [Laveau's] extreme allegations . . . but does support . . . a moderate degree of limitation . . . ." (*Id.* at 21–22).

Regarding Laveau's activities of daily living, the ALJ reviewed Laveau's testimony and remarked that Laveau "has demonstrated an ability to engage in robust activities, which the undersigned notes requires attention and concentration far more than he alleges he has." (*Id.* at 22). The ALJ found Laveau's statements about "disability, inability to maintain concentration

and memory difficulties are inconsistent with his activities of daily living and his ability to continue to work on projects around the house." (*Id.*).

The ALJ also noted:

> [T]he neuropsychological evaluation obtained in March 2009, indicated that a review of his responses indicates evidence of exaggeration of psychiatric symptoms, such that [Laveau's] endorsement of symptoms was greater than psychiatric samples in an inpatient setting. . . . The allegations of worsening of symptoms have been based mostly on his subjective reports and no recent neuropsychological testing has been obtained to discredit the earlier neuropsychological tests obtained in 2004, 2006[,] and 2009, none of which demonstrate memory loss is severe as alleged.

(*Id.*).

The ALJ briefly remarked upon the termination of Laveau's most recent job and speculated about his motivation or lack thereof to find further work, noting

> [Laveau] reported his last job in December 2005 ended due to termination and not due to his impairments. The fact [that Laveau] was terminated due to performance related issues is not related to total disability. The claimant may not be motivated to find employment as he is comfortable with his VA compensation benefit of $2823 per month and his State of Minnesota pension of $521.00 per month.

(*Id.*) (citations omitted). The ALJ also expressed doubt about Laveau's credibility by writing that Laveau's testimony that he could perform an easy job like cleaning combined with Laveau's ability to work on household projects, "shows [Laveau]'s attention and concentration are not as severe as he alleges." (*Id.* at 23).

Regarding the opinion evidence, the ALJ considered the following opinions and afforded them varying degrees of weight. He gave "significant weight to [Dr. Prokop's] opinion regarding the claimant's limitations as Dr. Prokop is familiar with the disability evaluation process and he had the opportunity to review the entire record." (*Id.*). The ALJ adopted Dr. Prokop's limitations in his RFC. (*Id.*).

The ALJ gave "great weight" to the opinion of the psychological consultative examiner, Dr. Wagner, "[b]ased on the examination and its consistency with the overall evidence, course of treatment and medications, [and] daily activities . . . ." (*Id.*). The ALJ incorporated Dr. Wagner's limitations into the RFC. (*Id.*).

The ALJ did not explicitly specify the degree of weight that he gave the opinions of the state agency psychological consultants at the initial level, but he incorporated their opinions into his RFC analysis because they "reviewed the evidence of record, including the consultative psychological evaluation, and utilized specialized knowledge in assessing mental impairments and resulting limitations within the SSA standard of disability." (*Id.*).

The ALJ gave "little weight" to the physical assessments conducted by the state agency medical consultant "as evidence received at the hearing along with the claimant's testimony show the claimant's physical impairments cause more than a minimal limitation on the claimant's ability to do basic work activities." (*Id.*). The ALJ also briefly noted:

> Given [Laveau]'s allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of specific function-by-function restrictions placed on the claimant by his treating doctors. Yet a review of the record in this case reveals no such restrictions have been recommended by any of his treating doctors.

(*Id.*).

At step four, the ALJ found Laveau "was unable to perform any past relevant work[]" as a construction worker or as a security supervisor. (*Id.* at 23–24).

Before moving to step five, the ALJ made several additional observations. First, he noted that Laveau was an individual of advanced age who had recently changed age category to "closely approaching retirement age." (*Id.* at 24); *see also* 20 CFR § 404.1563. He also noted that Laveau had a high school education and could communicate in English. (Admin. R. at 24); *see*

*also* 20 CFR § 404.1564. Finally, he noted that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." (Admin. R. at 24).

At step five, the ALJ found that "[t]hrough the date[] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (Admin. R. at 24); *see also* 20 C.F.R. §§ 404.1569, 404.1569(a). The ALJ relied on the testimony of the vocational expert to conclude that Laveau could do custodial work or become a machine cleaner. (Admin. R. at 24). Thus, the ALJ concluded that Laveau was not under a disability as defined in the Social Security Act from the alleged onset date through the date last insured. (*Id.* at 25).

## II.    STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.*

31

§ 423(d)(2)(A).

### A.    Administrative Record

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision. 20 C.F.R. § 404.909(a). A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. *Id.* § 404.929. If the claimant is dissatisfied with the ALJ's decision, then Appeals Council review may be sought, although that review is not automatic. *Id.* § 404.967–.981. If the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action. 42 U.S.C. § 405(g); 20 C.F.R. § 404.981.

### B.    Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). The Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)). The Court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). Yet this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable

difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (quoting *Jackson v. Bowen*, 873 F.2d 1111, 1113 (8th Cir. 1989)).

> Substantial evidence is merely such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Substantial evidence on the record as a whole, however, requires a more scrutinizing analysis. In the review of an administrative decision, [t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (citation and internal quotation marks omitted).

In reviewing the ALJ's decision, the Court analyzes the following factors: (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v. Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. § 404.1512(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate [residual functional capacity] remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on the record as a whole permits one "to draw two inconsistent positions . . . and one of those represents the Commissioner's findings," then the Commissioner's decision should be affirmed. *Pearsall v.*

*Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). The Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III.   DISCUSSION

Laveau challenges the ALJ's decision on two grounds. First, he argues substantial evidence in the record as a whole does not support the ALJ's determination that he does not "have a listed impairment." (Laveau's Mem. of Law in Supp. of Mot. for Summary J., "Laveau's Mem. in Supp.") [Doc. No. 11 at 13]. Second, Laveau argues that substantial evidence in the record as a whole does not support the ALJ's determination that Laveau is capable of performing other work that exists in significant numbers in the national economy. (*Id.*).

### A.   The Listings

Laveau argues the ALJ erred in finding that Laveau does not meet a Listing. (*Id.*). Laveau does not specify which Listing he meets, but instead relies almost exclusively on Dr. Carter's testimony during his first DIB proceeding, where Dr. Carter found Laveau met the Listing for 12.04 (affective disorders) and 12.06 (anxiety related disorders).[23] (*Id.* at 18–19; *see also Laveau I R&R*, 2012 WL 983598, at *6. He also argues that Dr. Prokop "relied solely on the GAF scores without looking into the details any further." (*Id.* at 19). Although Dr. Prokop said if Laveau met the Listings in the past, he had improved, Laveau argues his condition is "fairly stable presently as it was in 2005 through 2008." (*Id.*).

---

[23]   Steven Carter, PsyD ("Dr. Carter"), was the medical expert who testified at the hearing before the ALJ in Laveau's first application for Social Security benefits. *See Laveau I R&R*, 2012 WL 983598, at *6.

The Commissioner argues that the ALJ appropriately gave *Laveau I* res judicata effect by expressly deciding not to reopen that decision. (Comm'r's Mem. in Supp. of Mot. for Summary J., "Comm'r's Mem. in Supp.") [Doc. No. 15 at 12–13]. Whether to reopen a previous decision is not reviewable by a district court. (*Id.*); *see also Robertson v. Sullivan*, 979 F.2d 623, 625 (8th Cir. 1992). The Commissioner also argues the ALJ properly relied on Dr. Prokop's opinion. (Comm'r's Mem. in Supp. at 14–16).

As an initial matter, Dr. Carter was reviewing Laveau's symptoms based on an AOD of December 31, 2005, and Dr. Carter testified on October 9, 2008. *See Laveau I R&R*, 2012 WL 983598, at *1, 6; (Admin. R. at 592–602). Therefore, Dr. Carter's opinion logically could not relate to Laveau's symptoms after February 19, 2009, the AOD in this case. Further, the ALJ specifically noted that he was not reopening the earlier decision and that no new material related to the earlier claim was presented. *See* (Admin. R. at 11). Therefore, the Court does not rely on Dr. Carter's testimony in evaluating the ALJ's decision regarding whether Laveau meets a Listing.

Laveau argues that his medical condition is "fairly stable presently as it was in 2005 through 2008[,]" and he still meets the Listing described by Dr. Carter. (Laveau's Mem. in Supp. at 19). Laveau states: "He still has avoidance of individuals, including family members. He still has difficulty completing simple tasks without making mistakes. He still has difficulty completing simple tasks quickly. His pace and persistence and concentration is simply not there. And his social functioning is non-existent, for the most part." (*Id.*). But Laveau does not point to any medical records in support of his argument, much less medical records that suggest that Laveau had "marked" restrictions in any of the "paragraph B" criteria. *See* (*id.*).

The Court finds that substantial evidence supports the ALJ's determination that Laveau

does not meet a Listing. As an initial matter, Laveau does not specify which Listing he meets, and therefore, the Court only considers the Listings addressed by Dr. Carter, which were 12.04 (affective disorders) and 12.06 (anxiety related disorders), and are the only specific listings mentioned in Laveau's analysis. (Laveau's Mem. in Supp. at 18–19); *see Laveau I R&R*, 2012 WL 983598, at \*6 (describing Dr. Carter's testimony). In this case, the ALJ considered 12.04, *inter alia*, but not 12.06. (Admin. R. at 15). This is not significant, however, because the ALJ considered "paragraph B" criteria, which is the same for both 12.04 and 12.06. (*Id.*); *see* 20 C.F.R. 404, Subpt. P, App. 1, §§ 12.04, 12.06. Additionally, Laveau's arguments are limited to only social functioning and concentration, persistence, and pace. (Laveau's Mem. in Supp. at 19). Thus, those are the only two "paragraph B" criteria the Court considers. *See Ollila v. Astrue*, Civ. No. 09-3394 (JNE/AJB), 2011 WL 589037, at \*11 (D. Minn. Jan. 13, 2011) (stating that because the plaintiff did not indicate which listing she met or equals, and did not cite any evidence in the record, her argument is waived) (citations omitted), *report and recommendation adopted*, 2011 WL 589588 (Feb. 10, 2011).

### 1.     Social Functioning

According to the SSA,

Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

> We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2).

The ALJ noted Laveau had moderate restrictions in social functions because he texts and talks on the phone about three times a week, has a good relationship with his children, a fair relationship with his friends, a good relationship with past co-workers, and a fair relationship with past supervisors. (Admin. R. at 15–16). Laveau does not go out in public very often because he gets nervous around others. (*Id.* at 15). The ALJ also noted that Laveau had undergone therapy. (*Id.* at 16). The ALJ found these limitations demonstrated a moderate restriction, but not a marked restriction. *See* (*id.*). In reaching his decision, the ALJ relied on Laveau's function report, Laveau's report to the consultative examiner, and Dr. Prokop's testimony. *See* (*id.* at 15–16) (citing *id.* at 199–204, 1700, 1753).[24] These sources are consistent with other sources in the record, namely Laveau's reports on social activities to Dr. Cohen. *See* (*id.* at 1369). There, Laveau reported increased anxiety in public, meaning he does not leave the house often, and he only grocery shops with his wife for about fifteen to twenty minutes before needing to leave the store. (*Id.*). The Court finds the evidence in the record as a whole supports the ALJ's decision. *See Chong Vang v. Colvin*, 934 F. Supp. 2d 1054, 1088 (D. Minn. 2013) (PJS/JSM) (finding the ALJ's determination of moderate social function was supported by the record where the claimant got along well with her children, her responses to the examining psychologist were logical and

---

[24]     Although the ALJ refers to Dr. Prokop's testimony, the ALJ cites a treatment note from a December 9, 2009 appointment with Correll. (Admin. R. at 15–16) (citing Admin. R. at 1700). Regardless, Dr. Prokop's testimony is consistent with the ALJ's determination: he testified that Laveau's social functioning was moderate based on medical records. (*Id.* at 46–47).

goal oriented, and the record reflected her ability to go in public and tolerate superficial interactions with others).

### 2.     Concentration, Persistence and Pace

With respect to concentration, persistence, and pace, the SSA states:

> Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3).

In this category, the ALJ found Laveau had moderate, but not marked difficulties. *See* (Admin. R. at 16). The ALJ noted Laveau's reports of difficulty with memory, completing tasks, and following instructions. (*Id.*). The ALJ stated that Laveau's digit recall was at the 50th percentile rank, and Laveau was in the average range for "fund of knowledge," current-event knowledge, and verbal abstract capacity. (*Id.*). In support of his determination, the ALJ cited Laveau's function report and the consultative examiner's report. (*Id.*) (citing *id.* at 202, 1754). In the RFC analysis, the ALJ noted that Laveau's testimony was not consistent with other records regarding his functioning and was therefore not credible. (*Id* at 20). The ALJ refers to Dr. Prokop's testimony describing mild symptoms based on Laveau's GAF scores in the 60s. (*Id.* at 21). The ALJ also found Laveau's statements "of disability, inability to maintain concentration and memory difficulties" were not consistent with his daily activities and ability to continue to work on household projects. (*Id.* at 22). In support, the ALJ cited Laveau's function report, and emergency room reports of injuries he sustained as the result of accidents during household projects. (*Id.*) (citing *id.* at 196–204, 1213, 2171–94). The ALJ also noted Dr. Cohen's reports

that Laveau exaggerated his symptoms, and stated, "no recent neuropsychological testing has been obtained to discredit the earlier neuropsychological tests obtained in 2004, 2006[,] and 2009, none of which demonstrate memory loss is severe as alleged." (*Id.*).

The Court finds the evidence in the record as a whole supports the ALJ's finding. In addition to the records cited by the ALJ, other medical records support the ALJ's decision. Laveau typically rated his concentration between 1 and 5 during the period August 19, 2009, to August 24, 2010, during his appointments with Michals for medication management and therapy. (*Id.* at 1326–27, 1337, 1348, 1359, 1438, 1464).[25] On October 21, 2010, Laveau described his concentration as an 8, which is severe. (*Id.* at 1603). But Michals's notes reflect that this rating is still "adequate for daily living," and she assigned him a GAF score of 63. (*Id.* at 1603, 1606). Additionally, Laveau's GAF scores were consistently between 60 and 63, with only one exception.[26] (*Id.* at 1281, 1283, 1287, 1320, 1329, 1342, 1365, 1488, 1674, 2095). *See Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010) (noting that a claimant with consistent scores at 50 or below constituted serious symptoms while a history of scores from 52–60 only indicates moderate symptoms).

The Court finds substantial evidence in the record as a whole supports the ALJ's determination that Laveau did not have marked impairments in the two "paragraph B" criteria challenged by Laveau. Because Laveau does not challenge any other "paragraph B" criteria, the ALJ did not err in finding that Laveau did not meet a Listing.

### B.   Substantial Evidence that Laveau Can Perform Work

Laveau's arguments that substantial evidence in the record does not support the ALJ's

---

[25]     On two other occasions, no numerical score was provided, and Michals's notes reflect only Laveau's description of his concentration. *See* (Admin. R. at 1313, 1629).
[26]     The exception is Dr. Cohen's GAF score of 50–55. (Admin. R. at 1373).

finding that he can perform other work appears to fall into the following categories: (1) the ALJ erred in failing to find any physical limitations based on Laveau's hearing loss, skin condition, low back pain, obstructive sleep apnea, and an injury to his right hand; (2) the ALJ erred in finding Laveau not credible when the ALJ stated that Laveau was not motivated to look for work because of his VA pension; and (3) the ALJ erred in not deferring to the VA's opinion that Laveau was disabled. (Laveau's Mem. in Supp. at 18, 20–21). The Court addresses each argument in turn.

A "[r]esidual functional capacity is what a claimant can do despite [his] limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and [the] claimant's description of [his] limitations." *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001).

### 1. Lack of Physical Limitations

As stated above, Laveau argues the ALJ erred in failing to find any physical limitations based on Laveau's hearing loss, skin condition, low back pain, obstructive sleep apnea, and an injury to his right hand. (Laveau's Mem. in Supp. at 18). The Court addresses each alleged physical limitation in turn.

### a. Hand Injury

With respect to his hand injury, Laveau states only the following: "There has also been the recent episode involving his right hand[,] although that may not have resulted in long term limitations." (*Id.*). The Commissioner notes that Laveau's argument about his hand injury is unclear. (Comm'r's Mem. in Supp. at 18). To the extent Laveau is referring to the injury sustained in 2012, the Commissioner argues that it is not appropriately considered because it occurred after the DLI. (*Id.*).

In his recitation of the facts, Laveau cites to medical records from 2012 regarding his hand injury. (Laveau's Mem. in Supp. at 5) (citing Admin. R. at 2151–70, 2178–80). Laveau makes no argument regarding why this injury should be considered for the time period between the AOD and DLI. *See generally* (Laveau's Mem. in Supp.). Laveau must establish his disability as of the date he was last insured. *See Davidson v. Astrue*, 501 F.3d 987, 989 (8th Cir. 2007). Because Laveau's hand injury in 2012 was after his DLI of December 10, 2012, his hand injury cannot be considered for the purposes of disability. *See id.*

### b.      Hearing Loss

Laveau makes no specific arguments regarding why his hearing loss should result in a functional limitation. *See generally* (Laveau's Mem. in Supp.). The Commissioner argues waiver for failure to develop this argument, and points to medical evidence that Laveau's hearing loss is well treated by the hearing aids and does not prevent employment. (Comm'r's Mem. in Supp. at 21–22).

Because Laveau makes no argument about how his hearing loss results in a physical RFC limitation and cites to no medical records, the argument is waived. *See Ollila*, 2011 WL 589037, at *11. Even if the argument was not waived, it is without merit. The ALJ stated that "[t]here has been little subsequent treatment for these physical conditions [hearing loss and skin condition] and no work-related limitations have been imposed by any treating physician related to these conditions[,]" and cited the physical RFC assessment. (Admin. R. at 21) (citing *id.* at 1780). Even so, the ALJ limited Laveau to "work with no frequent loud noises." (*Id.*). The RFC assessment recommended that Laveau avoid concentrated exposure to noise, and the ALJ incorporated this into his RFC. (*Id.* at 16–17, 21, 1784). Additionally, Laveau testified that his hearing was "fairly decent" with his hearing aids. (*Id.* at 42). Dr. Cohen noted that although

Laveau had hearing loss, he had "good hearing" with the use of his aids. (*Id.* at 1369). The record does not reflect any functional impairment as a result of Laveau's hearing loss, and impairments that are "controllable by treatment or medication" are not disabling. *See Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014). Thus, independent of waiver the argument, the ALJ's decision finding Laveau's hearing loss did not further limit his RFC is also supported by substantial evidence in the record as a whole.

### c.      Skin Condition

With respect to his skin condition, Laveau claims he is "assuredly limited to something less than medium level work" because exerting himself "too much," such as lifting fifty pounds regularly as provided for by "medium level work," would result in sweating "too much," which would irritate his skin condition. (Laveau's Mem. in Supp. at 18). Laveau also argues the ALJ was obligated to discuss, "[a]t a minimum, . . . why he is not putting physical limitations on Mr. Laveau's activities as a result of the skin condition . . . " as it relates to "exposure to dust, fumes, pollutants, extremes of heat and cold, humidity, etc. . . . ." (*Id.*).

The Commissioner argues that the ALJ documents that Laveau's condition is well controlled and Laveau does not point to any error in the ALJ's analysis. (Comm'r's Mem. in Supp. at 21). Additionally, the ALJ limited Laveau's exposure to sunlight consistent with his testimony about his skin condition. (*Id.*).

The ALJ stated that "[t]here has been little subsequent treatment for these physical conditions [hearing loss and skin condition] and no work-related limitations have been imposed by any treating physician related to these conditions." (Admin. R. at 21) (citing *id.* at 1780). Nonetheless, the ALJ limited Laveau's RFC to "work that does not involve being outdoors and in the sunlight[.]" (*Id.*). In other words, the ALJ did limit the RFC based on Laveau's skin

condition by restricting his ability to be outdoors and in the sunlight. *See* (*id.* at 21). The Court finds the ALJ's decision is supported by substantial evidence in the record.

First, Laveau's testimony demonstrates that his skin condition is controlled by medication and a specific brand of soap. (*Id.* at 42–43). Second, Dr. Cohen describes the rash as "largely resolved." (*Id.* at 1369). Third, in the physical RFC assessment, Dr. Grant did not find that Laveau's skin condition points to any exertional limits, and he marked "unlimited" with respect to Laveau's environmental exposure to "[f]umes, odors, dusts, gases, poor ventilation, etc." (*Id.* at 1781, 1784). The only limitation in the RFC related to Laveau's skin condition is "work that does not involve being outdoors and in the sunlight." *See* (*id.* at 21). The Court finds this decision is supported by substantial evidence in the record.

### d.      Low Back Pain

Laveau argues that due to his age and degenerative disc disease, he "probably has to avoid heavy lifting[,] . . . heavy bending, twisting and other manipulation of his spine." (Laveau's Mem. in Supp. at 18). In his recitation of facts, Laveau refers to a radiology report dated June 6, 2006, that states that he has degenerative disc disease. (*Id.* at 4) (citing Admin. R. at 320). The Commissioner argues that the diagnosis does not explain any limitations, the record does not reflect limitations, Laveau did not apply for disability based on low back pain, and Laveau stated that he was "not physically challenged" in his function report. (Comm'r's Mem. in Supp. at 19) (quoting Admin. R. at 202).

The Court finds the ALJ's decision is supported by substantial evidence. First, Laveau did not make any allegation that he was disabled due to back pain. He did not apply for disability

based on low back pain. *See* (Admin. R. at 188).[27] This is considered significant when the ALJ finds no related limitations. *Dunahoo*, 241 F.3d at 1033. Further, he denied having any physical challenges in his function report, and did not mark lifting, squatting, bending, standing, reaching, walking, sitting, or kneeling as areas that are affected by his condition. (Admin. R. at 202). Second, although Laveau reports back pain, nothing in the record reflects any limitation based on this. *See, e.g.*, (*id.* at 1755). For these reasons, the Court finds that the ALJ's decision that Laveau was not limited by his low back pain is supported by substantial evidence in the record as a whole.

### e.    Sleep Apnea

Laveau argues the ALJ was obligated to discuss, "[a]t a minimum, . . .why he is not putting limitations [on Mr. Laveau's activities] regarding exposure to dust, fumes, pollutants, extremes of heat and cold, and humidity, etc. as a result of the . . . sleep apnea/obstructive pulmonary condition." (Laveau's Mem. in Supp. at 18). The Commissioner argues Laveau's sleep apnea is mild, he did not apply for disability on this ground, no medical records support a functional limitation, the RFC assessment states that Laveau can withstand unlimited exposure to this category of irritants, and the jobs the ALJ referred to "require only minimal exposure to environmental irritants." (Comm'r's Mem. in Supp. at 20).

Because Laveau makes no argument about how his sleep apnea results in a physical limitation in his RFC and cites to no medical records, the argument is waived. *See Ollila*, 2011 WL 589037, at *11. The Court also finds substantial evidence in the record supports the ALJ's

---

[27]    Laveau claims he applied for Social Security based, in part, on "problems with his back[.]" (Laveau's Mem. in Supp. at 4) (citing Admin. R. at 1968). The portion of the Administrative Record that Laveau cites, however, is the report by the state agency consultant who reviewed the mental RFC. (Admin. R. at 1968). The comment about "back pain" in that record reflects Laveau's report and is not mentioned in the list of all physical and mental conditions he reported that limit his ability work. *See* (*id.* at 188, 1968).

decision.

The medical records show Laveau participated in a sleep study that resulted in a diagnosis of mild sleep apnea on October 15, 2009. (Admin. R. at 1323).[28] He received a CPAP unit, and reported sleeping much better after using it. (*Id.* at 1321–22). On December 15, 2009, he reported to Michals that he was "having more restful sleep now that he adjusted to the CPAP." (*Id.* at 1315). In other words, the record shows that Laveau's sleep apnea was well treated and means his condition was not disabling. *See Turpin*, 750 F.3d at 993. Thus, the ALJ's decision to find that Laveau's sleep apnea did not contribute to his RFC is supported by substantial evidence in the record as a whole.

### 2.    Credibility

Laveau argues "the bases for rejecting Mr. Laveau's testimony as expressed by Judge Thomas the first time and now the ALJ the second time, fail." (Laveau's Mem. in Supp. at 19). The only error Laveau points to is the ALJ's statement that Laveau may be less motivated to look for work because he has a pension from the VA. (*Id.* at 20); *see also* (Admin. R. at 22). The Commissioner argues the ALJ properly discredited Laveau based on the evidence, and that Laveau does not develop this argument. (Comm'r's Mem. in Supp. at 23–24).

An ALJ finding a claimant not to be credible must provide reasons for discrediting the claimant and document the inconsistences uncovered. *Bakke v. Colvin*, No. 12-CV-538 (JNE/TNL), 2013 WL 4436178, at *5 (D. Minn. Aug. 16, 2013) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *Policy Interpretation Ruling Titles II and XVI: Evaluation of*

---

[28]    The ALJ says this diagnosis occurred in December 2009, but that is not correct. *See* (Admin. R. at 19) (citing *id.* at 1501). The evidence the ALJ cites is a record from Michals, quoting Dr. Alami's recommendation for Laveau to get a sleep study. (*Id.* at 1501). Dr. Alami made that recommendation on August 27, 2009. (*Id.* at 1334). Regardless, the timing of the sleep consult and diagnosis does not appear to be significant to the ALJ's determination regarding whether Laveau's sleep apnea required a functional limitation. *See* (*id.* at 19).

*Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7, 1996 WL 374186, at *2 (July 2, 1996). An ALJ "may discount subjective complaints . . . if they are inconsistent with the evidence as a whole." *Casey*, 503 F.3d at 695 (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). Because "[t]he ALJ is in the best position to determine the credibility of the testimony," this Court defers to an ALJ's decisions on credibility. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). "[A] claimant's financial motivation may contribute to an adverse credibility determination when other factors cast doubt upon the claimant's credibility." *Ramirez v. Barnhart*, 292 F.3d 576, 581 n.4 (8th Cir. 2002).

Although the ALJ did note that Laveau may be unmotivated to find work, the ALJ found Laveau not credible in other respects. First, the ALJ noted that medical records, such as his GAF scores and reports of depression and anxiety managed with medication, demonstrate that Laveau is functioning at levels higher than he alleges. (Admin. R. at 21). Second, the ALJ found the record supports moderate difficulties with respect to concentration and memory. (*Id.* at 21–22). Third, the ALJ noted that Laveau engaged in "robust activities [of daily living], which . . . require[] attention and concentration" greater than Laveau reports. (*Id.* at 22). Fourth, the ALJ noted the March 2009 report of exaggerated psychiatric symptoms. (*Id.*). Finally, the ALJ stated that Laveau's testimony that he could perform a job like cleaning demonstrated that his "attention and concentration are not as severe as he alleges." (*Id.* at 23). Therefore, the Court finds the ALJ's decision regarding Laveau's credibility is supported by substantial evidence in the record.

### 3.      The VA's Disability Determination

Laveau argues the ALJ failed "to give due deference to the [VA's] finding of disability." (Laveau's Mem. in Supp. at 20). Although Laveau acknowledges the ALJ is "not bound by the VA's decision," he argues the ALJ must "give appropriate deference to that decision[,]" and states that the ALJ did not explain why he did not agree with VA's finding that Laveau was 100% disabled. (*Id.*). The Commissioner argues that the ALJ is not bound by a decision made by the VA, and the other medical record evidence does not support the VA's decision. (Comm'r's Mem. in Supp. at 16–17).

Laveau raised this in his first federal court case, and the Court adopts Magistrate Judge Brisbois's legal standard:

> [T]he Commissioner is not bound by the disability determination of another agency. *See* 20 C.F.R. § 404.1504 ("A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us."); *Jenkins v. Chater*, 76 F.3d 231, 233 (8th Cir.1996) ("This court has held that a disability determination by the Veterans Administration is not binding on the ALJ."). "The ALJ should consider the VA's finding of disability, but the ALJ is not bound by the disability rating of another agency when he is evaluating whether the claimant is disabled for purposes of social security benefits." *Pelkey v. Barnhart*, 433 F.3d 575, 579–80 (8th Cir.2006) (internal citations omitted). Where the ALJ "fully consider[s] the evidence underlying the VA's final conclusion that" Plaintiff was disabled and he mentions the treatment records, the ALJ does not err. *Id.*

*Laveau I R&R*, 2012 WL 983598, at *15.

With respect to the VA, decision, the ALJ stated:

> A letter in July 2009, stated that he was awarded an 80 percent service connected benefit from the Veterans Affairs [sic]. The letter also explained that he was being paid at the 100 percent rate because he was unemployable due to his service-connected disabilities. However, the undersigned is not bound by the standard set by the Veterans' Administration's benefits as the disability program requirements under Social Security are different than the requirements under the Veteran's

Administration.

(Admin. R. at 18) (internal citations omitted). Thus, the ALJ's decision shows that he considered the VA's determination.

Additionally, the ALJ's decision shows that he considered the medical evidence underlying the VA' determination. *See Pelkey*, 433 F.3d at 579–80; (Admin. R. at 18). The VA's decision itself lists several documents it reviewed, but the only document it specifically refers to in its decision is Laveau's examination on March 17, 2009.[29] (Admin. R. at 132). The ALJ summarized Laveau's appointment with Dr. Cohen on March 17, 2009. (*Id.* at 18–19). The ALJ relied on this evidence in his credibility determination. *See* (*id.* at 22). Therefore, the ALJ did not err in his consideration of the VA's disability determination because he considered the determination and the underlying medical evidence.

## IV.    RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Laveau's Motion for Summary Judgment [Doc. No. 10] be **DENIED**; and

2.    The Commissioner's Motion for Summary Judgment [Doc. No. 14] be **GRANTED**; and

3.    Judgment be entered and the case be dismissed.


Dated: January 27, 2015

*s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

---

[29]    *See supra* note 13.

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of court, and serving all parties by **February 10, 2015**, a writing which specifically identifies those portions of this Report and Recommendation to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.